UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | No. 3:19-cr-120 (VLB) |
| v. | : | |
| | : | |
| JESUS TORRES-MIRANDA | : | JANUARY 8, 2021 |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |
| | : | |

MEMORANDUM OF DECISION
<u>DENYING DEFENDANT'S MOTION TO SUPRESS</u>

The Defendant, Jesus Torres-Miranda, was indicted on charges of Interference with Commerce by Robbery in violation of 18 U.S.C. § 1951 and Brandishing a Firearm in Furtherance of a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 924(c)(3). The Defendant moves to suppress his reported statement following his arrest, all evidence seized from his person, and the witness identification. [Dkt. 24 (Def. Mot. to Suppress)]; [Dkt. 25 (Def. Mem. in Supp.)]. The Court determined that Defendant's motion raised a factual issue warranting an evidentiary hearing, which was held on August 24, 2020. [Dkt. 31 (Order Granting Def. Mot. for Evid. Hearing)]; [Dkt. 59 (Hearing Tr.) at 3:21-3:25]; [Dkt. 56 (Marked Ex. List)]; [Dkt. 57 (Marked Witness List)].

This Order addresses only Defendant's motion to suppress all evidence seized from his person. Defendant's motion is rendered moot in so far as it seeks to suppress his reported statement following his arrest and the witness identification. The parties agreed to defer the issue of whether the show-up

1

identification should be suppressed as unduly suggestive because neither of the robbery victims could be located. [Dkt. 54 (Joint Notice Regarding Evid. Hearing)]. The Court, therefore, denies without prejudice Defendant's motion to the extent it seeks to suppress the identification with the understanding that the Government will not introduce evidence of the identification absent the Court's ruling on the identification's suggestibility.

After the evidentiary hearing, the Government proffers in its opposition brief that "[g]iven the state of the record concerning the defendant's ability to understand English, and his intentions to communicate in Spanish with the officers, the Government agrees that it will not offer the spontaneous statement in its case in chief…" [Dkt. 62 (Gov. Suppl. Mem. in Opp'n) at 3, n. 1]. Accordingly, the Court finds Defendant's motion to suppress the statement that Defendant allegedly made in the presence of police as moot.

The remaining issues are whether police had reasonable suspicion to conduct an investigative stop of the Defendant and whether the detention and search of his person exceeded the bounds of *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny. After considering the parties' initial briefs, the police officers' testimony at the evidentiary hearing, the exhibits, and the post-hearing briefing, the Court DENIES the Defendant's motion.

## Background Facts

The Court concludes that the Government has proved the following facts by a preponderance of the evidence. On the evening of February 15, 2019, police

received a report that an AT&T Store in Waterbury, Connecticut was robbed by two men, one brandishing a handgun. [Tr. at 12:03-12:08]; [Def. Ex. 102 (Call Summary Report With PROQA Remarks)]. The two store employees reported that the suspects took their wallets, one of their watches, money from the cash register, and cell phones from the store's safe. [Dkt. 25 (Def. Suppl. Mem.) at 2]. The location of one of the stolen devices was actively being tracked by AT&T and the information was dispatched to police as its location was updated. [Def. Ex. 102]; [Tr. at 44:09-44:13].[1]

The police call records show that, almost immediately after the robbery was reported, the tracking device was located traveling on the interstate highway. [Def. Ex. 102 at 2]. About a half hour later, at 7:09 P.M., dispatch reported that the device was "[m]oving on Cherry St. Cherry St. / Walnut." [*Id.* at 4]. Two minutes later, the device was in an alleyway behind a neighborhood market. [*Id.*]

That night, Officer Lee Farley, a Waterbury Police Department patrolman with five years of experience, was patrolling alone in a marked police vehicle near the

---

[1] **The record conflicts regarding the type of tracking technology used.** *Compare* **[Dkt. Ex. 2 at 1] ("dispatch was actively tracking a *phone* stolen from the incident which was PINGing (sic) in the area of Cherry St. and Walnut St. at approximately 1909 hours." (7:09 P.M.))(emphasis added) and [Tr. at 13:06-13:07](Officer Farley: "Yes, one of the *cell phones* being pinged, which is basically just being tracked...")(emphasis added) to [Def. Ex. 5 at 5(02/15/2019, Officer Charette Police Report] ("...also contained in the safe was a *GPS tracking device which was made to look like a cell phone*, which the men took...")(emphasis added). The Court assumes that the distinction between the GPS technology and cellular triangulation is immaterial as neither party draws this distinction nor addresses the relative accuracy of the type of tracking technology used.**

central part of the city. [Tr. at 10:13-10:15]. He responded to the alert over the police radio that the device was in the area of Cherry Street and Walnut Street. [Tr. at 10:08, 13:02-13:09]. Officer Farley testified that he heard a police broadcast describing the robbery suspects as two Hispanic males in their forties, both bearded, one wearing dark clothing and the other wearing an orange top. [Tr. at 12:11-12-23]. Officer Farley testified that he also heard that one of the robbery suspects had a duffle bag, but he did not include the duffle bag in the suspect description memorialized in his police report. [Tr. at 51:08-51:25]. Another patrolman, Officer Charles Bliss, explained that he heard Officer Charette broadcast descriptions of the suspects as men in their forties, one with a black and gray beard wearing a gray winter hat and orange jacket; and the other suspect with a beard, wearing a black hooded sweatshirt and carrying a black and red Nike duffle bag. [Tr. at 99:03-99:17].

Officer Farley testified that he did not know whether he was looking for a vehicle or the suspects on foot and he did not have a vehicle description. [Tr. at 49:08-49:18]. Given that the decoy containing the tracking device was located on an interstate highway traveling at a rate exceeding two miles in about thirty minutes, the Court infers that at least one of the suspects traveled by motor vehicle while in possession of the decoy.

At approximately 7:12 P.M, Officer Farley observed a man later identified as Mr. Torres-Miranda at the corner of Walnut Street and Welton Street, which he estimated was several hundred feet from the neighborhood market where the device was last tracked, although the distance on a map is closer to one thousand

4

feet. [Tr. at 49:23-50:07]; [Def. Ex. 2 (Farley Police Report) at 1]. At the time he observed the man, Officer Farley was driving his patrol car slowly in the same direction the man was walking, approaching the man from behind. [Tr. at 52:04-52:18]. Officer Farley estimated that he was "a couple of blocks away" from the man when he observed him initially and he continued driving slowly toward him. [Tr. at 52:12-52:13]. When asked by the Court for a more precise estimation of the distance, Officer Farley estimated that the distance was "give or take two hundred feet." [Tr. at 61:17-62:06; 63:13-63:20]. The man was opposite a streetlight, illuminated by the streetlight and the headlights of Officer Farley's patrol car. [Tr. at 76:05-76:20]; [Def. Ex. 102 (Google Maps daytime street view)]. As Officer Farley continued to approach, the man turned around. *Id.* When he turned around towards him, Officer Farley observed the man's hands and face and identified him as a bearded Hispanic man, approximately in his forties, wearing dark clothing. *Id.* As Officer Farley drove closer to the man, he observed him reach his hands around towards the front of his body, and then appear to drop an unknown object onto the ground. [Tr. at 15:24-16:22]. Officer Farley observed that the man did not reach back down to pick up the object and that he was stomping his feet in the snow, leading Officer Farley to suspect the man intentionally dropped an object to conceal it from him. [Tr. at 16:13-16:22].

As he continued to approach the man in his patrol car, Officer Farley ordered the man to show him his hands. [Tr. at 17:09-17:13]. When Officer Farley was about fifty feet away from the man, he could see the man was holding a plastic-wrapped Apple iPhone box. [Tr. at 17:20-18:03; 63:22-64:06]. Officer Farley ordered him to

lay on the ground by pointing his fingers and the man complied and was handcuffed without incident. [Tr. at 18:08-18:22; 19:06-19:07]. Officer Farley located an unopened iPhone box in plastic wrap upon handcuffing him. [Tr. at 70:18-71:10]. Very soon thereafter, Officers Brito and Bliss arrived on scene and Mr. Torres-Miranda was placed in the back of a police vehicle, but was not formally placed under arrest, while police investigated further. [Tr. at 85:01-85:25; 86:21-86:24; 68:02-68:25; 21:01-21:07]. Officer Farley attempted to explain to the man that he was being detained and was not under arrest, however, the man did not speak English. [Tr. at 18:21-19:10].

The record does not establish how police ascertained the man's identity. Officer Farley testified that Officer Brito conversed with Mr. Torres-Miranda in Spanish and obtained his identification orally prior to them placing Defendant in the police vehicle. [Tr. at 20:22-21:05 (Farley direct)]:

> Q: ... don't want you to tell the Court what is said but does Officer. Brito converse with Mr. Torres-Miranda?
>
> A. To get his identification and hearing the utterance.
>
> Q. Okay. All right. And then what happens to Mr. Torres-Miranda at that point? Is he left on the ground? Is he taken somewhere?
>
> A. So at that point, we escorted him into the rear of the police cruiser pending further investigation.

However, Officer Brito denied ever speaking to Mr. Torres-Miranda. [Tr. at 86:10-86:17 (Brito direct)]:

> A. Officer Farley stated to me that he tried to communicate with the gentleman, but he kept getting -- answered in Spanish only.
>
> Q. Okay. Did the suspect say anything to you?

A. Not directly, no.

Q. Excuse me?

A. Not directly to me, no. I never spoke to the gentleman directly.

The police reports do not shed any light on how the man was identified as Mr. Torres-Miranda. [Def. Exs. 2, 5]. Considering the contradicting testimony regarding whether Defendant identified himself orally, it appears more likely that police obtained an identification card from Defendant's person during a pat down search prior to placing him in the police vehicle; Officer Brito testified that he assisted in a pat-down search prior to placing Defendant in a police vehicle. *See* [Tr. at 88:11-88:14]. There is no evidence that Defendant was removed from the police vehicle until immediately prior to the show-up identification, after the pistol was discovered and he was formally arrested on state firearms charges. *Infra*. 7-9. Therefore, police must have known Defendant's name and date of birth at or around the time he was placed in the police vehicle given the timing of the database queries.

While Mr. Torres-Miranda was detained in a police vehicle, Officer Farley canvassed the area and discovered the grip of a black pistol sticking out of the snow near the fire hydrant where he observed Mr. Torres-Miranda stomping his feet. [Tr. at 21:06-21:11][Gov. Exs. 1-2 (police photographs of exposed pistol grip)](authenticated at Tr. at 22:13-26:13 and 89:15-90:17).

There is some ambiguity in the record concerning how long Mr. Torres-Miranda was detained before the pistol was discovered. On direct examination, Officer Farley estimated that he initially detained Defendant for fifteen or twenty

minutes, but on cross examination he could not remember the length of time. [Tr. at 32:24-33:12; 70:01-70:17]. The dispatch records reflect that the firearm was reported 29 minutes after the initial encounter. [Def. Ex. 102 at 4] ("15A in snow Welton and Walnut per A6"). Since Officer Farley detained Mr. Torres-Miranda after he saw him, but before he found the firearm and reported his discovery, the detention must have been less than 29 minutes. [2]

While Mr. Torres-Miranda was detained, Officer Farley ran Defendant's information through state and local law enforcement databases and learned that he did not have a valid Connecticut pistol permit and he had a prior felony conviction. [Tr. at 27:20-28:01]. A check of the pistol's serial number revealed it had been stolen. [Tr. at 28:02-28:04]. Officer Farley then formally arrested Mr. Torres-Miranda on state firearms charges. [Tr. at 28:05-28:10]. Once Defendant was formally placed under arrest, Officer Farley removed him from the police vehicle and conducted a search of Defendant's person prior to the show up identification. [Tr. at 28:14-28:18; 72:1-72:07]. Two wallets belonging to the robbery victims were discovered in Defendant's inside jacket pocket and one of the victim's smartwatches was discovered in another pocket. [Tr. at 28:14-28:18; 71:13-71:14]. Officer Farley estimated that about a half hour passed between Mr. Torres-Miranda

---

[2] The Court agrees with the Defendant's interpretation of the dispatch records, but Defendant miscalculates the length of time as 39 minutes. [Dkt. 61 (Def. Suppl. Mem.) at 8]. Officer Farley first observed the Defendant at 7:12 P.M. [Def. Ex. 2 (Farley Police Report) at 1] and reported the discovery of the gun at 7:41 P.M [Def. Ex. 102 at 4].

being placed in handcuffs and the search for weapons and contraband on his person. [Tr. at 72:01-72:11].

Finally, in Defendant's affidavit in support of his motion to suppress, he avers that once "[m]ore officers arrived, [w]hile I was handcuffed on the ground[,] the officers punched and kicked me, including in the head and face, breaking some of my teeth." [Def. Ex. 4 (Torres-Miranda Aff.) ¶ 4]. Both responding officers who were asked about Defendant's detention each denied using or observing the use of force beyond the application of handcuffs, denied that Defendant was injured, and denied that he requested medical attention. [Tr. at 33:15-33:17, 34:01-34:09, 74:23-75:15 (Farley Test.); 90:18-90:25, 96:04-96:11 (Brito Test.)]. Defendant previously filed his booking photograph as evidence of alleged excessive force, but the Court cannot conclude that the officers used forced beyond what they claimed in their testimony because no visible injuries appear in Defendant's booking photograph and Defendant has not adduced any medical evidence in support of his claimed injuries. *See* [Def. Ex. 3 (Booking photo.)].

<u>Discussion</u>

I.    <u>Legal Standard</u>

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To 'safeguard Fourth Amendment rights generally,' . . . the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence '[w]hen the police exhibit deliberate, reckless, or grossly

negligent disregard for Fourth Amendment rights,' . . . ." *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (citing to *Herring v. United States*, 555 U.S. 135, 139–40 (2009) and *Davis v. United States*, 564 U.S. 229, 237 (2011)). Because the exclusion of evidence "exacts a heavy toll on the justice system . . . the exclusionary rule does not apply whenever suppressing evidence 'might provide marginal deterrence.'" *United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) (citing to *Herring*, 555 U.S. at 141)).

On "a motion to suppress [evidence based on the exclusionary rule], the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, that the search or seizure did not violate the Fourth Amendment." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014)(citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980), *cert. denied*, 450 U.S. 917 (1981) and *United States v. Bayless*, 921 F.Supp. 211, 213 (S.D.N.Y.1996)); *see also United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005).

Here, as to the remaining issues, Defendant's affidavit carried his initial burden of challenging his initial seizure and search. In particular, there were disputed facts concerning the degree of force used to initially detain Mr. Torres-Miranda. [Def. Ex. 4 (Torres-Miranda Aff.) ¶ 4]. Mr. Torres-Miranda also claimed that his pockets were immediately searched, and items removed from his clothing as soon as he was handcuffed, rather than after police discovered the pistol in the snow and after Defendant's identity and the pistol's serial number were queried.

10

[*Id.* ¶ 5]. Accordingly, the burden is on the Government to establish the lawfulness of the search and seizure.

## II.   Whether Mr. Torres-Miranda's initial detention was supported by reasonable suspicion?

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)). Thus, warrantless searches and arrests are permissible when justified by the circumstances.

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (citing *Terry v. Ohio*, 392 U.S. 1, 22-23 (1968)). Under *Terry,* a police officer may, consistent with the Fourth Amendment, briefly detain an individual for questioning if they have reasonable suspicion that criminal activity is afoot. To establish reasonable suspicion, "police must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Id.* at 21. This is an objective standard, requiring "considerably less proof of wrongdoing by a preponderance of the evidence," but more than an "officer's inchoate suspicion or mere hunch." *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992) (citations omitted). The

Court considers the totality of the circumstances and the deductions and inferences drawn by a trained police officer, which "might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981).

In determining whether such a limited seizure is reasonable, a court should balance "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 51 (1979). The stop must be justified at the time of the seizure, thus "any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013).

As a threshold matter, the Defendant must be either searched or seized within the meaning of the Fourth Amendment. A police officer's order to stop constitutes a seizure if "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). This arises in two contexts: either when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained. *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009).

Defendant argues that he was seized for constitutional purposes when Defendant immediately complied with Officer Farley's order that Defendant show him his hands. [Dkt. 61 (Def. Supp. Mem.) at 15]. The Government concedes that Defendant was seized for constitutional purposes, but instead argues that the

12

seizure was supported by reasonable suspicion of ongoing criminal activity. *See* [Dkt. 62 (Gov. Suppl. Mem. in Opp'n) at 6-7]. As the parties agree Defendant was seized when he complied with Officer Farley's order to stop and show him his hands, the issue for the Court to resolve is whether Officer Farley's detention of Mr. Torres-Miranda was supported by reasonable suspicion.

Defendant contends Officer Farley did not have reasonable suspicion based on the information known to him and the reasonable inferences and deductions he could have drawn from that information. Mr. Torres-Miranda supports his position by noting certain acts known to Officer Farley.  He points out that when Officer Farley observed him the tracking device was signaling a location one thousand feet away, the Defendant was walking alone in a location that was not inherently suspicious, his appearance was inconsistent with the dispatched description of one of the suspects because he was not wearing an orange jacket or a grey beanie or carrying a red and black Nike duffle bag, and that the description of the second suspect was too vague. [Dkt. 61 (Def. Supp. Mem.) at 16-17]. Defendant posits Officer Farley's observation was unreliable and that his observation that Mr. Torres-Miranda is a Hispanic man in his forties with a beard was too generalized and vague to support reasonable suspicion that criminal activity was afoot. [*Id.*]. Defendant argues that this case is analogous to *Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016), a civil case holding that reasonable suspicion was lacking because the officer relied on a vague description of a suspect in an innocuous location, in the absence of any furtive activity.

The Government contends the investigatory stop was supported by reasonable suspicion because Officer Farley observed that Defendant: (1) fit the description of one of the two suspects involved in an armed robbery; (2) was seen in close geographic and temporal proximity to the robbery; (3) was near where the stolen GPS tracking device indicated someone connected to the robbery would be; and (4) upon seeing a police cruiser, made evasive and furtive movements and appeared to furtively discard an item. [Dkt. 62 (Gov. Suppl. Mem.) at 6-7].

In performing its analysis, the Court must consider the totality of facts known to Officer Farley and reasonable deductions drawn from those facts to decide whether Officer Farley reasonably suspected that Mr. Torres-Miranda was one of the robbery suspects.  Prior to observing Mr. Torres-Miranda, Officer Farley knew that there was an armed robbery, that there were two suspected robbers, and that a tracking device stolen during the robbery was in the general vicinity, within a thousand feet. Two deductions could be drawn from the movement of the tracking device prior to the police stop: the device traveled by vehicle and the device was not on Mr. Torres-Miranda's person. Neither of these inferences are necessarily telling because Officer Farley knew that there were two suspects, multiple devices were stolen, and there was only one decoy, meaning that the robbery suspects could have traveled to the neighborhood and then separated, with or without dividing the stolen property or the decoy.

Similarly, Defendant fit the description of one of the robbery suspects, albeit the more generalized description; thus, the fact that Defendant was not wearing an orange top, a grey beanie hat, or carrying a duffle bag could not exclude him as a

suspect. The generalized description alone would not support reasonable suspicion; but the description was not the only basis upon which Officer Farley suspected Mr. Torres-Miranda to be one of the robbery suspects.

Officer Farley testified that he made the following observations. As he approached a figure from behind, he saw Mr. Torres-Miranda turn around and look in his direction. In addition to observing that the person was a bearded Hispanic male approximately forty years old, he observed Mr. Torres-Miranda acting suspiciously after seeing the patrol car. As Officer Farley got closer, he observed the man's hands moving around his upper torso and saw the man drop something to the ground. The man did not pick up the fallen object, but instead appeared to attempt to conceal it by stomping the snow. To add to Officer Farley's suspicion, the man fitting the description of one of the robbers acting furtively was in the vicinity of the decoy.

The Court must consider Officer Farley's credibility. His testimony is not a model of clarity as to the space and time of certain events, which the Court noted during the evidentiary hearing. *See* [Tr. at 30:01-30:02](The Court: "There's no progression here. This is not making a lot of sense."). However, upon close review of the transcript of the testimony of all the witnesses and the parties' exhibits which include the time-stamped dispatch records, a sequence of events emerges that, considering the totality of the circumstances, establish reasonable suspicion for the investigatory stop.

15

Defendant argues that Officer Farley made an unreliable racial identification based on the complexion of Mr. Torres-Miranda's hands from at least fifty feet away, in the dark. [Dkt. (Def. Supp. Mem.) at 17-18]. It is clear to the Court that Officer Farley initially had a limited view of the Defendant, but as the officer drove closer and Mr. Torres-Miranda turned around and looked at him Officer Farley was able to see him more clearly as he was illuminated by the streetlight and the patrol car's headlights. [Tr. at 76:05-76:20]. At the time Officer Farley instructed him to lie down he was close enough to clearly discern Mr. Torres-Miranda's physical characteristics and confirm that he met the description of the more pedestrian robber. Given the rapidly evolving events, it is understandable that Officer Farley was not able to give a precise second-by second account of his observations, but considering them in their totality, they are credible.

More importantly, Officer Farley did not stop Mr. Torres-Mutanda based solely on his appearance.  He decided to stop him only after he observed Mr. Torres-Miranda drop an unknown object into the snow, and then attempt to conceal it

Mr. Torres-Miranda's reliance on *Dancy* is misplaced because the scenario here is materially different. It is distinguishable in several key respects. There, the Second Circuit affirmed a district court's finding in a civil case that reasonable suspicion was lacking where the suspect only "somewhat" matched the vague description of a robbery suspect, vaguely described as a thin black male in a brown jacket. *Dancy*, 843 F.3d at 101. The plaintiff-suspect was a thin black male wearing a camouflage-patterned coat, with green, light green, and brown patches. *Id.* at 100.

The consistent portion of the description of the suspect, described only as a thin black male, was too vague to justify a stop. *Id*. at 109. The court in *Dancy* noted the absence of suspicious circumstances. His location was otherwise innocuous. *Id*. at 109-110. The fact that the plaintiff-suspect merely looked over his shoulder at the approaching patrol car was not itself suspicious and is legally insufficient to warrant an investigatory stop, an issue well established by case law and commonsense judgments about human behavior. *Id*. at 110. The plaintiff-suspect was neither extremely nervous nor evasive. *Id*. ("Officer McGinley did not suggest that they appeared nervous, attempted to conceal anything, changed direction, ran away, quickened their pace, or made furtive gestures.").

Here, Mr. Torres-Miranda was not stopped because he matched the suspects' race or because he happened to be in the vicinity of the tracking device alone. Mr. Torres-Miranda's appearance was consistent with the description dispatched to police that was more specific than that relayed in *Dancy*, i.e. to include estimated age and facial hair. Unlike the suspect-plaintiff in *Dancy*, Mr. Torres-Miranda's actions reasonably led police to believe that he was attempting to conceal contraband or a weapon upon observing the police vehicle approaching him from behind. In addition, Defendant was also within walking distance of the decoy containing the tracking device stolen during the robbery. The question is, therefore, not whether the physical description alone warranted an investigatory stop, but rather whether the description of a similar looking person in the vicinity of the stolen item behaving suspiciously justified an investigatory stop. *See Brown v. City of Oneonta,* 221 F.3d 329, 334 (2d Cir. 2000)(dicta)("[A] description of race

and gender *alone* will rarely provide reasonable suspicion justifying a police search or seizure.")(emphasis added)*;*

Mr. Torres-Miranda's evasive behavior is pivotal. The Supreme Court has said "...evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citations omitted). Here Torres-Miranda's furtive and secretive behaviors coupled with his matching age, race, clothing, facial hair, proximity to the decoy, combine to distinguish this case from *Dancy*. Finally, another critically distinguishing fact is that Officer Farley saw the iPhone box in Mr. Torres-Miranda's hand before instructing him to lie down. [Tr. at 17:20-18:03]. Combined, these facts make Officer Farley's suspicion of Mr. Torres-Miranda eminently reasonable.

Having determined that Officer Farley had reasonable suspicion to suspect that criminal activity was afoot, the Court turns to the issue of whether Defendant's detention exceeded the confines of *Terry* to constitute a de facto arrest.

### III. Whether Mr. Torres-Miranda's detention constitutes a de facto arrest.

Under *Terry* and its progeny, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Fla. v. Royer*, 460 U.S. 491, 500 (1983). An investigative detention that exceeds these bounds of time and methodology becomes a *de facto* arrest, which must be supported by probable cause or exigent circumstances. *Id.* at 491. The

relevant factors considered by the Second Circuit are: "(1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004)(surveying cases).

These factors recognize that law enforcement officers conducting a *Terry* stop may need to undertake protective measures when they have a reasonable basis to think that the detainee poses a physical threat, including the drawing of firearms and the use of handcuffs. *Id.* (surveying cases). Additionally, "[i]n assessing whether a detention is too long in duration to be justified as an administrative stop, [the Court] considered it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Defendant argues that he was arrested once Officer Farley handcuffed him to "prevent further flight," and Officer Farley did not believe that Defendant was armed because Officer Farley took no immediate measures to search him for weapons and then held him for an extended period of time in the police vehicle. [Dkt. 61 (Def. Mem. in Supp.) at 26-28]. The Government argues that Officer Farley's actions were reasonably calibrated to safely and immediately secure an individual that he had reason to suspect was armed with a firearm recently brandished in a robbery. [Dkt. 62 (Gov. Supp. Mem.) at 11].   The Court agrees with the Government.

Officer Farley's conduct and observations leading up to the investigatory stop and immediately upon stopping Mr. Torres-Miranda demonstrates that he was concerned that Defendant was armed. Officer Farley knew that a handgun was brandished during the robbery and he approached Defendant slowly and at an extended distance to maintain cover from his vehicle. [Tr. at 17:01-17:05]. Officer Farley remained in his patrol car when he ordered Defendant to show him his hands. [Tr. at 17:09-18:07]. Officer Farley did not exit his vehicle after he saw the Apple iPhone box until after Mr. Torres-Miranda complied with his instruction to lay down and Officer Farley could see he did not have anything in his hands or easily reach for a weapon. [Tr. at 18:08-18:20].

Officer Farley waited to proceed with his investigation until back-up arrived. [Tr. at 67:15-67:18]. Given the information already available to Officer Farley and his earlier observation, the unopened cellphone box increases the likelihood that Defendant was one of the two suspects in the armed robbery. Officer Farley was patrolling alone and knew that the "pickup" was for two armed robbery suspects and the tracking device was nearby, meaning that there was a risk the defendant or a nearby confederate could possess or retrieve a weapon. Officer Farley attempted to explain to Defendant that he was being detained and was not under arrest, but the Defendant did not speak English. [Tr. at 18:21-19:10]. Officer Farley testified that he did not locate the weapon until two other officers arrived and he could "relieve [his] attention from him to focus on the rest of the scene at hand." [Tr. at 67:15-67:18].

Defendant's argument contemplates why Officer Farley handcuffed him upon observing that he did not have a weapon in his hand. However, Officer Farley's subjective intention does not factor into the analysis of whether Defendant's detention amounted to an arrest. *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004)("Vargas's claim that he was arrested when he first came in contact with the police is based largely on the misplaced argument that the officers intended to arrest him at the outset. However, the officers' subjective intent does not calculate into the analysis of when Vargas was arrested."). The question is whether Officer Farley's decision to handcuff Mr. Torres-Miranda and place him in the police cruiser pending further investigation was objectively reasonable.

A minimal intrusion to assure officer safety is objectively reasonable. The application of handcuffs and the placement of Defendant in a police vehicle was a reasonable response to a legitimate safety concern and the least intrusive means of assuring officer safety during the encounter, *c.f.* the drawing of a service weapon. *See United States v. Fiseku*, 915 F.3d 863, 872 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1643, 203 L. Ed. 2d 917 (2019)(surveying cases involving application of handcuffs when suspect may be armed). Officer Farley's decision to handcuff Defendant prior to the arrival of backup was a cautious reasonable measure to prevent Defendant from accessing the object that he secreted. The U.S. Supreme Court has "expressly recognized that suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Michigan v. Long*, 463 U.S. 1032, 1048 (1983). The risk to officer safety was amplified by the fact that the stop occurred at night, the elevated degree of

21

suspicion after the new cellphone box was discovered, another suspect remained at large, and the decoy was signaling a location only a thousand feet away, apparently on the move and possibly in a vehicle. *See* [Def. Ex. 102 (Call Summary Report With PROQA Remarks) at 4-6].

As *Sharpe* instructs, "[a] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." 470 U.S. at 686–87. Ultimately, the "…question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 687. Considering the developing situation, the proximity of the stolen cellphone decoy, the unknown location of the other armed robbery suspect and the need to secure the scene and process the evidence discovered, the Court concludes that handcuffing the Defendant and then placing him in the vehicle while searching for the item he secreted were reasonable protective measures. See *United States v. Hester*, No. S1 19-CR-324 (NSR), 2020 WL 3483702, at *12 (S.D.N.Y. June 26, 2020)(surveying cases and concluding that handcuffing and placing suspect in police vehicle during investigation into a "shots-fired" incident were not unreasonable). For the same reasons, removing Mr. Torres Miranda from the snow-covered ground and placing him in the patrol car was reasonable not only from a police safety standpoint but from the standpoint of Mr. Torres-Miranda's safety and wellbeing.

The duration of Defendant's detention does not exceed *Terry*'s bounds. "In assessing whether a detention is too long in duration to be justified as an

investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. In *Sharpe*, the U.S. Supreme Court reversed the Court of Appeal's adoption of a per se rule that a 20-minute detention was too long to be justified under *Terry*. Instead, the inquiry considers whether there is any delay unnecessary to the legitimate investigation triggering the stop. *Id.* at 687.

Here, the record is hazy about the precise duration of time between events. Based on the time Officer Farley first observed Defendant and when he reported the discovery of the firearm over the radio, the Defendant must have been detained for less than a half hour while police searched for the object he dropped. During Defendant's detention, Officer Farley located the new iPhone box and alerted the forensics unit to the firearm, which needed to be preserved as evidence and secured. The discovery of the firearm warranted queries from three databases: the NCIC, the state's pistol permit database, and a database including the pistol's serial number. The query of the serial number could not have been completed until the pistol was removed from the snow. Officer Farley testified that Defendant was not formally arrested on the state firearms charges until the pistol was discovered and the queries returned, which he estimated took about 15 to 20 minutes, and then on cross examination stated that it was about 30 minutes. [Tr. at 32:08-32:14; 72:08-72:11]. The Court concludes that, even the outer estimate of time would not render the duration of detention unreasonable given the serious nature of the issues and the absence of any identifiable delay by police. *See United States v. Place*, 462 U.S.

696, 709 (1983)(expressly declining to adopt an outside limitation for a *Terry* stop, but concluding that the search was unreasonable because police failed to minimize the intrusion by neglecting to diligently investigate); *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995)(surveying cases and holding that a 30 minute delay was reasonable); *United States v. Hooper*, 935 F.2d 484, 497 (2d Cir. 1991)(same). There is no claim or evidence that the officers failed to diligently investigate the scene of the detention, Mr. Torres-Miranda's identity, qualification to possess a firearm or criminal record, or the status of the firearm.

The only challenge lodged by Mr. Torres-Miranda, is the claim that he was beaten by the officers.  Mr. Torres-Miranda describes a brutal encounter with multiple police officers in which he claims he suffered multiple injuries. [Def. Ex. 4 (Torres-Miranda Aff.) ¶ 4]. The only evidence offered to substantiate his claim is his booking photograph. *See* [Def. Ex. 3 (Booking photo.)]. The photograph does not support this claim. In it he appears neat, clean and alert.  There are no visible bruises or lacerations. While one of his eyes is somewhat closed, it is not discolored or swollen.  In the face of evidence to the contrary, the Court finds Mr. Torres Miranda has not made a credible claim that he was assaulted by the detaining officers.

The Court concludes that Officer Farley's detention of Mr. Torres-Miranda was constitutional because it was supported by objective facts establishing reasonable suspicion of ongoing criminal activity. Mr. Torres-Miranda's detention does not constitute a de facto arrest because the amount of force used, and the length and conditions of detention were reasonable under the circumstances.

Because the Court concludes that Defendant's detention was lawful and that he was not arrested until probable cause existed for the state firearms charges, the Court need not address whether probable caused existed for the instant federal charges at the time police initially detained Defendant.[3]

### III.   When were Defendant's pockets searched?

The Court must resolve a final factual dispute regarding when Defendant's pockets were searched before determining whether the evidence must be suppressed. The issue hinges on whether the Defendant's pockets were searched, and the robbery victims' wallets and a watch discovered, before or after police had probable cause to arrest the Defendant on the state firearms charges.

Although the Defendant's initial seizure was lawful, it does not necessarily follow that the search of his person was lawful, as it could exceed the bounds of *Terry*, 392 U.S. at 29-30, as police are limited to frisking the outer layer of clothing

---

[3] This case poses an interesting issue rendered academic by the Court's ruling that the bounds of *Terry* were not exceeded. Officer Farley believed that he did not have probable cause to arrest Defendant prior to learning that Defendant was prohibited from carrying a firearm under state law and that the firearm was stolen. *See* [Tr. at 71:17-72:06, 29:05-29:11]. But what if Officer Farley's judgment was mistaken and probable cause existed to arrest Defendant for the robbery when Officer Farley discovered the new iPhone box?

In *Morelli v. Webster*, 552 F.3d 12 (1st Cir. 2009), the First Circuit reversed in part the district court's grant of summary judgment in an unusual civil case involving a botched sting operation where a suspected prostitute refused to consummate any criminal act related to prostitution, but took twenty dollars after she suspected that the undercover officer was not a bona fide customer. The First Circuit reversed the district court and held that her detention in a hotel room amounted to a de facto arrest given the officer's physical characteristics and use of force, but officers had probable cause to arrest her for petty theft despite their erroneous conclusion that they could not arrest her on any charges. *Id.* at 22.

when they reasonably suspect that a detainee may be armed. *See also Minnesota v. Dickerson*, 508 U.S. 366 (1993)(plain feel test for contraband); *see e.g., United States v. Casado*, 303 F.3d 440 (2d. 2002) (search of detainee's pocket during *Terry* stop was unreasonable and violated Fourth Amendment, and therefore drugs found in pocket were inadmissible, even though police officer who reached into pocket had reason, based on detainee's initial refusal to remove his hand from the pocket, to suspect presence of a weapon; officer could have protected his safety by using less serious intrusion of a pat down).

As noted above, Defendant's affidavit claimed that multiple police officers searched and removed items from his clothing while he was handcuffed and laying on the ground. [Def. Ex. 4 (Torres-Miranda Aff.) ¶ 5]. Defendant's statement is not precise as to when, in the sequence of events, he was searched. He chose to exercise his constitutional rights not to testify at the evidentiary hearing. The reasonable inference drawn from his statement is that he was searched before being placed in the patrol car and thus before he was placed under arrest.

Testimony and physical evidence introduced at the hearing contradicted Mr. Torres-Miranda's account and undermine his credibility. Officer Farley testified that he did not search Defendant's person until after he was formally arrested on the state firearms charges. [Tr. at 71:13-72:07]. While Officer Farley did not testify to seeing what other officers did, his police report states "I then placed Torres under arrest for CGS 53a-217 Criminal Possession of Firearm…Search incident to arrest (sic) I searched Torres's property and located two wallets inside of his outer jacket pocket.". [Def. Ex. 2 at 3].   Additionally, Officer Brito, who assisted Officer Farley

26

with the pat down, made no reference to wallets, which suggests that they were discovered later, thus corroborating Officer Farley's account of when the search was conducted, and the wallets were discovered. [Tr. at 92:16-92:18]. Mr. Torres-Miranda's unsupported and contradicted claim that he was brutalized by and suffered injuries at the hands of the police officers tends to undermine his credibility.

Even if the Court correctly assumed that Defendant's identity was ascertained by searching his person for an identification card at or around the time he was placed in the back of the police cruiser, it does not necessarily follow that the search of his coat pockets occurred then. Mr. Torres-Miranda's affidavit does not state what items were removed from his clothing, which articles of clothing were searched, or what items were retrieved. Notably, Officer Farley's police report uses the word "property," suggesting that Defendant's long coat may have been removed before he was placed in the police cruiser but not searched until later.

Officer Farley personally discovered a pistol near where he also observed the Defendant reach down and then stomp his feet. Therefore, Officer Farley could reasonably infer that the pistol was in Mr. Torres-Miranda's possession immediately prior to their first interaction. Police then ascertained that Mr. Torres-Miranda did not have a valid Connecticut Permit to Carry Pistols and Revolvers, that he had a prior felony conviction, and then checked the pistol's serial number and received a report that it was stolen from another police department. [Def. Ex. 2 at 2]. Even if the Court were to exclude consideration of the criminal charges that required police to ascertain his identity, probable cause existed that he possessed

the stolen firearm independent of his identification. The Defendant posits no reason to challenge the validity of these database searches, nor does the Defendant challenge the existence of probable cause that he committed the state firearms charges.

The Court finds that there was probable cause to arrest Mr. Torres-Miranda for one or more of the state firearm charges as set forth in the arresting officer's report: Conn. Gen. Stat. § 53a-217 Criminal Possession of Firearm, Conn. Gen. Stat. § 53a-217c Criminal Possession of a Pistol or Revolver, Conn. Gen. Stat. § 53a-212 Theft of a Firearm, Conn. Gen. Stat. § 29-35 Carrying a Pistol without a Permit, and Conn. Gen. Stat. § 29-33 Illegal Transfer or Sale of a Firearm.

In *Chimel v. California*, 395 U.S. 752, 763 (1969), the U.S. Supreme Court held that officers may lawfully search an arrestee's person and area within their immediate control without a warrant contemporaneous with a lawful arrest. The rationale behind the search incident to arrest exception is that it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape," and in order to "prevent [the] concealment or destruction" of evidence on the arrestee's person. *Id.* at 763. *Chimel*'s exception to the warrant requirement applies squarely here.

Thus, the Court will not suppress the robbery victim's wallets as they were discovered during a search incident to a lawful arrest for state firearm offenses.[4]

### Conclusion

The Court DENIES Defendant's Motion to Suppress because the evidence obtained in Defendant's pocket was found during a search incident to a lawful arrest on state firearms charges following a constitutional investigatory detention. The Clerk shall docket the exhibits introduced at the evidentiary hearing.

Additionally, the parties shall jointly file a notice indicating their readiness to proceed with trial within 14 days of this Order. The parties shall note the Chief Judge's December 3, 2020 General Order continuing all jury trials until after February 1, 2021 because of the ongoing exigent circumstances caused by the COVID-19 pandemic. Pursuant to the Chief Judge's Order, priority is to be given to short trials involving defendants who have been detained the longest. If the Defendant is seeking a continuance past the Court's next available jury date,

---

[4] **The Defendant has not moved to exclude admission of the pistol. His motion seeks to exclude only: (2) evidence seized from his person/effects and the firearm was not on his person. However, it bears mentioning that a warrantless seizure of evidence is permitted when it is plainly in view and when its incriminating character is "immediately apparent," and the officer has the lawful right to access the object itself. *Horton v. California*, 496 U.S. 128, 135-36 (1990). The seizure of the item need not be inadvertent. *Id.* at 141. Here, Officer Farley was on a public street and personally observed the pistol's grip sticking out of the snow. Therefore, the plain view exception to the Fourth Amendment's warrant requirement would likely apply.**

February 16, 2021, the Defendant shall file a motion to continue with a proposed trial date and accompanied by an executed speedy trial waiver.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: January 8, 2021